IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| 401 NORTH WABASH VENTURE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| ASCHER BROTHERS CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff 401 North Wabash Venture LLC ("Wabash"), by its attorneys, Novack and Macey LLP, as and for its Complaint against Defendant Ascher Brothers Co., Inc. ("Ascher"), states as follows.

## NATURE OF THE ACTION

1. This is an action to quiet title and for compensatory and punitive damages. Ascher is a contractor that performed painting and wall covering work in Wabash's mixed-use commercial and residential high rise in Chicago. It had a written contract for this work in the amount of $5,050,000. During the course of its work the parties executed various change orders, which raised the contract price to right around $6 million. Indeed, Ascher admitted all of this in late October 2009 when it signed a lien waiver (and wrote a letter to the Construction Manager) confirming that the total contract price including all approved change orders was a little over $5.9 million.

2. Remarkably, four months later, without any further approved or submitted change orders, and without performing any further substantial work, Ascher, after experiencing financial difficulties, changed its tune and began claiming that the contract price was really more than $9 million. Worse still, Ascher intentionally and maliciously filed a mechanics lien in which it

falsely claimed that it is due more than $4 million in excess of the actual amount that Ascher's unambiguous written contract provides for Ascher to be paid. Ascher's baseless lien claim is clouding Wabash's title to the property and causing Wabash damages.

### PARTIES, JURISDICTION AND VENUE

3. Plaintiff Wabash is a limited liability company and its sole member is 401 Mezz Venture LLC ("Mezz"). Mezz is a limited liability company whose members are comprised of three limited liability companies: Trump Chicago Managing Member LLC; Trump Chicago Member LLC; and TIHT Chicago Member Acquisition LLC. The sole member of each of these three limited liability companies is Donald J. Trump, a citizen of the State of New York. By reason of the foregoing, Wabash is a citizen of the State of New York.

4. Defendant Ascher is an Illinois corporation with its principal place of business in Chicago, Illinois and, therefore, is a citizen of the State of Illinois.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 based on diversity of citizenship because the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because Ascher resides in this district and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

### FACTS COMMON TO ALL COUNTS

7. Wabash is the developer of the Trump International Hotel & Tower -- Chicago, a mixed use commercial, hotel and residential high rise located at 401 North Wabash, Chicago, Illinois (the "Property"). At all relevant times, Wabash has held an ownership interest in the Property.

2

      8.      Bovis Lend Lease, Inc. ("Bovis") is the Construction Manager for the Property.

**The Contract**

      9.      Effective March 8, 2007, Bovis, acting as agent for Wabash, entered into a Trade Contract (the "Contract") with Ascher, pursuant to which Ascher agreed, among other things, to provide painting and wall covering contracting services at the Property for the Contract Price of $5,050,000. A copy of the Contract is attached hereto as Exhibit A.

      10.     Under Article 1.10 of the Contract, the term "Work" means:

> the furnishing of all labor and/or materials by Contractor, at or for the benefit of the Project; unless specifically excepted, the furnishing by Contractor of all equipment, supplies, plant, tools, scaffolding, transportation, superintendence, inspections and temporary construction of every nature; that which is to be produced and supplied pursuant to the Contract; and the obligation of Contractor to visit the Project site, and to fully acquaint and familiarize itself with the site, surrounding and subsurface conditions and the character of the operations to be carried on at the site, and make such investigations as Contractor may deem fit or as may be prudent for Contractor to fully understand the facilities, physical conditions and restrictions attending the Work.

(Ex. A., Art. 1.10.)

      11.     Article 18.1 of the Contract provides:

> The Contractor represents that it has inspected the Project site and has satisfied itself as to the condition thereof and that the Contract Price is just and reasonable compensation for all the Work and for the Contractor's assumption of the risk of all foreseen and unforeseen risks, hazards, and difficulties in connection with the performance of the Work.

      12.     Article 19 of the Contract governs "Change Orders/Claim for Extra Cost/Time Extensions" and provides, among other things, that "[a]ll changes in the Work shall be authorized only by written Change Orders executed by Construction Manager's Project Manager," and that "[a]ll changes in the Work shall be performed pursuant to the Contract Documents." (Ex. A, Art. 19.1.)

3

13. Article 19.5 of the Contract provides:

> If Contractor [Ascher] claims an increase in the Contract Price . . . by reason of a change in the Work, Contractor shall give Construction Manager [Bovis] written notice thereof within ten (10) days after Contractor's knowledge of the occurrence of the matter giving rise to such claim. This notice shall be given by Contractor before proceeding to execute the changed Work . . . . No such claim shall be valid unless notice is given as aforesaid.

14. Finally, Article 27.2 of the Contract provides that:

> [t]he Contract constitutes the entire agreement between the parties. No representations or other agreements have been made other than as set forth in the Contract. The Contract may not be amended or any term or provision waived except in writing signed by Owner. Without limitation, no term or provision of the Contract may be amended or waived by conduct of the parties.

(Ex. A, Art. 27.2.)

**The Change Orders**

15. During the course of Ascher's performance under the Contract, Bovis and Ascher executed 16 Change Orders. Each Change Order described in detail particular "changes in the Work" and provided for the total Contract Price to be increased or decreased by an amount equal to the total price of the work approved thereunder. Each Change Order also states that, "[e]xcept as specifically set forth hereinabove, Contractor waives any and all other claims it may have arising out of or relating to the above referenced changes to the Trade Contract." Copies of the Change Orders are attached hereto as Group Exhibit B.

16. The total dollar amount approved under the 16 Change Orders was $985,389. When added to the original Contract Price, these change orders resulted in a Revised Trade Contract Amount of $6,035,389 as of October 30, 2009 (the "Revised Trade Contract Amount"). (Ex. B, Change Order dated 10/30/09.)

4

17. Ascher's acknowledgement of, and agreement to, the Revised Trade Contract Amount is demonstrated both by the Change Orders and also lien waivers that accompanied the Change Orders and were signed by Ascher and Bovis.

18. Among others -- and just weeks before completing its work at the Property -- Ascher executed a Waiver of Lien dated October 27, 2009, which includes the sworn statement of Ascher's CFO Ed Orlowsky "[t]hat the total amount of the contract including extras* is $5,905,389.00 on which [Ascher] has received payment of $5,006,480.00 prior to this payment." The Waiver of Lien further provides that the term "extras," as used in the foregoing sentence, "include but are not limited to change orders, both oral and written, to the contract." A copy of the October 27 Waiver of Lien is attached hereto as Exhibit C. The sworn contract amount and payment amount in the October 27 Waiver of Lien is identical to the amounts shown in the Change Orders as of that date.

19. Although Ascher continued to perform a few odds-and-ends tasks as late as December 2009, Ascher's required work under the Contract was substantially completed as of the end of October 2009.

20. Except as set forth in the Change Orders, Wabash has not approved, and Ascher has not requested, any other changes to the Contract Price. Consistent therewith, Ascher has never given written notice of any other claim for any increase in the Contract Price pursuant to Article 19.5 of the Contract.

**Final Reconciliation Of Credits**

21. Upon completion of all Work under the Contract, as amended by the Change Orders, Ascher owed back certain credits for services and costs that had been included in the original Contract Price, but were never rendered or incurred by Ascher. The total amount of

5

such credits due under the Contract is $794,376, resulting in a final Trade Contract Amount of $5,241,013 (the "Final Contract Amount"). In a Change Order dated February 24, 2010, Bovis provided Ascher with a final reconciliation that includes a statement of all credits due and the Final Contract Amount. A copy of the February 24, 2010 Change Order is attached hereto as Exhibit D.

22. Ascher has refused to sign the February 24, 2010 Change Order.

23. Out of the $5,241,013 Final Contract Amount, Ascher has been paid $5,025,083, with only the contractual holdback amount, if any, to be paid upon the final closeout of the Contract.

**The Mechanics Lien Claim**

24. On February 23, 2010, Ascher caused to be filed in the office of the Cook County Recorder of Deeds a Notice and Claim For Mechanic's Lien (the "Mechanic's Lien") against the Property and Wabash's ownership interest therein. A copy of the Mechanic's Lien is attached hereto as Exhibit E.

25. Despite its consistent and repeated admissions as to the Revised Trade Contract Amount, Ascher now makes the knowingly false claim in the Mechanic's Lien that the Contract amount is $9,180,373. This claimed amount exceeds the agreed Revised Trade Contract Amount by more than $3 million, and exceeds the Final Contract Amount by almost $4 million.

## COUNT I

### (Claim To Quiet Title)

26. Wabash restates and realleges paragraphs 1-25 as Paragraph 26 of this Count I.

27. The Mechanic's Lien is invalid because it falsely claims that the amount due under Ascher's Contract is $4,155,290.

6

28. Wabash is the developer of, and has an ownership interest in the Property subject to the rights of condominium unit purchasers.

29. Wabash is in possession of the Property subject to the rights of condominium unit purchasers.

30. Ascher's actions described above are contrary to Wabash's ownership interest, place a cloud on Wabash's title to the Property, and prevent Wabash from exercising exclusive possession, dominion and control over the Property.

31. The wrongful conduct alleged herein is of such character that principles of equity permit and direct this Court to maintain jurisdiction over Wabash's action to quiet title.

WHEREFORE, Wabash respectfully requests that this Court enter judgment in its favor and against Defendant Ascher as follows:

A. Quieting title in Wabash and removing the cloud on the Property created by Ascher's lien;

B. Declaring that Wabash owns the Property free and clear of any purported interest of Ascher;

C. Declaring that Ascher's claimed interest in the Property is void and of no force or effect;

D. Ordering that Ascher take and participate in whatever action is necessary to remove from the public record any indication of its purported interest in the Property;

E. Awarding Wabash its costs of suit; and

F. Granting Wabash such other and further relief as the Court deems appropriate.

7

## COUNT II

### (Slander of Title)

32. Wabash restates and realleges paragraphs 1-31 as Paragraph 32 of this Count II.

33. Ascher's Mechanic's Lien is a false and malicious publication of a claim that Ascher knows is baseless -- in particular, Ascher's claim that: (a) the amount of the Contract is $9,180,373; and (b) the amount due and owing to Ascher is $4,155,290.

34. Ascher's publication of its false Mechanic's Lien claim has disparaged, and continues to disparage Wabash's title to the Property.

35. Ascher knew that its disparaging statements were false or acted with reckless disregard for the truth or falsity thereof.

36. Wabash has suffered and will continue to suffer damages as a direct and proximate result of Ascher's publication of the false Mechanic's Lien claim including, but not limited to, costs incurred to post bonds in amounts in excess of the amount of the lien claim filed by Ascher.

WHEREFORE, Wabash respectfully requests that the Court enter judgment in its favor and against Defendant Ascher as follows:

A. Awarding Wabash compensatory damages in an amount to be determined at trial;

B. Awarding Wabash punitive damages in an amount to be determined at trial;

C. Awarding Wabash its attorneys fees and costs of suit; and

D. Granting Wabash such other and further relief as the Court deems appropriate.

## COUNT III

### (Damages)

37. Wabash restates and realleges paragraphs 1-36 as Paragraph 37 of this Count III.

38. As a direct and proximate result of Ascher's unlawful conduct alleged herein, including its publication of the false Mechanic's Lien claim, Wabash has suffered and will continue to suffer damages in an amount to be determined at trial, including, without limitation, costs incurred to post bonds in amounts in excess of the amount of the lien claim filed by Ascher.

39. As a direct and proximate result of Ascher's unlawful conduct alleged herein, including its malicious publication of the false Mechanic's Lien claim, Wabash is entitled to punitive damages.

WHEREFORE, Wabash respectfully requests that the Court enter judgment in its favor and against Defendant Ascher as follows:

A. Awarding Wabash compensatory damages in an amount to be determined at trial;

B. Awarding Wabash punitive damages in an amount to be determined at trial;

C. Awarding Wabash its attorneys fees and costs of suit; and

D. Granting Wabash such other and further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY**

Respectfully submitted,

401 NORTH WABASH JOINT VENTURE LLC

By: /s/ John F. Shonkwiler
One of Its Attorneys

Stephen Novack
P. Andrew Fleming
John F. Shonkwiler
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900
Doc# 347111

9